UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA        :

V.                              :    Case No. 3:04-CR-360 (RNC)

ANTHONY HARRIS                  :


RULING AND ORDER

New Haven police officers apprehended the defendant after
a car chase, searched his person, and later searched his car,
which he had abandoned in an attempt to avoid being captured.  A
handgun and narcotics were found in the glove compartment.  The
defendant has moved to suppress these items on the ground that
the warrantless search of the glove compartment violated the
Fourth Amendment.  The government opposes the motion on the
grounds that the police officers had probable cause to believe
the car contained contraband, the defendant relinquished any
legitimate expectation of privacy he might have had in the car by
abandoning it, the police had a safekeeping duty to be sure the
car did not contain drugs or weapons, and the search was
conducted incident to the defendant's lawful arrest.  An
evidentiary hearing has been held.  Based on the evidence
presented at the hearing, I agree with the government that the
search was supported by probable cause and therefore deny the

defendant's motion.[1]

FACTS

The facts are essentially undisputed.  On December 3, 2004, at around 2:00 p.m., Officer Thomas Herbert was using a laser gun to track speeders on Ella T. Grasso Boulevard in New Haven, where the posted speed limit is 35 miles per hour.  He was doing this while standing on the side of the road near his cruiser.  Officer Brian Donnelly was parked in another cruiser nearby.  The defendant passed their location driving a Nissan four-door sedan. Herbert alerted Donnelly that he had clocked the defendant going 52 miles per hour.  The officers followed the defendant in their respective cruisers intending to stop him for a speeding violation.

Herbert activated his flashing lights and siren and pulled up behind the defendant at a red light.  Using a loudspeaker, he ordered the defendant to move to the right when the light turned green.  After the light changed, the defendant drove slowly to the right, in seeming compliance with the officer's order. Herbert saw the defendant lean forward and to the right, as if he was reaching beyond the car radio in the direction of the glove compartment.  The defendant did this while his car was still going about 10 miles per hour, which was unusual behavior in the

---

[1]  Because the police had probable cause to search the car, it is unnecessary to consider the government's other arguments.

eyes of Officer Herbert, who at the time had been a patrol officer for nearly 15 years.

Officer Herbert used his air horn to signal the defendant to stop.  The defendant looked in his rear view mirror, made eye contact with Herbert, then suddenly accelerated, and sped away. Herbert went after him, notified the police dispatcher of the defendant's flight, and described the defendant as wearing a black knit cap.

The defendant proceeded to weave through traffic at an unreasonable speed, swerving across the center line to pass cars on the left, then swerving back again to pass cars on the right. In the course of doing this, he ignored several red lights and stop signs.  Because the defendant was driving so recklessly, clearly endangering himself and others, Officer Herbert decided to discontinue the chase.  He turned off his lights and siren, and dropped back, but kept the defendant in view so he could keep the dispatcher informed of the defendant's route.

The defendant turned onto Mead Street.  Officer Donnelly had just entered Mead Street from the opposite direction, anticipating that he might be able to intercept the defendant there, and was waiting in his parked cruiser when he saw the defendant's car approach.  The defendant quickly turned into a driveway near a residence at 21 Mead Street, jumped out of the car and fled on foot, leaving the driver's door wide open.

Donnelly saw the defendant run from the rear yard of 21 Mead Street in the direction of a vacant convalescent home on nearby Winthrop Street, jumping over fences as he ran.  The defendant was being chased at that point by an off-duty police officer, Officer McKnight, who happened to be driving in the area listening to his police scanner when he heard about the defendant's flight.  Officer McKight found the defendant hiding at the Winthrop Street property, detained him and put him in handcuffs.  Officer Herbert soon arrived in his cruiser.  He had been in continuous radio contact with Donnelly, who had kept him informed of the defendant's actions.  Herbert confirmed that the defendant was the person he had seen driving the Nissan, placed the defendant under arrest, and gave him Miranda warnings.

Herbert then conducted a pat down search of the defendant's pockets.  The search revealed that the defendant was carrying more than $3,500 in cash.  This extraordinarily large sum was bundled in increments of $100, which were stacked on top of each other.  Drug dealers are known to bundle and stack large amounts of cash in this manner because it makes it easy to count the money and make change.  The defendant also had a wallet, which contained more cash, but he had no car key in his possession.

Officer Herbert asked the defendant why he had taken off. The defendant said he was scared.  Herbert then asked him why he had leaned forward and to the right while his car was still

4

moving.  The defendant responded that he was "going to open the glove box and forget about it."  Herbert wanted the defendant to explain what he meant by that but the defendant declined to say anything more.  Herbert then drove the defendant around the block to 21 Mead Street.

On arriving there, Herbert encountered Officer Donnelly.  Donnelly had already searched the interior of the Nissan but had been unable to get into the glove compartment because it was locked.  At or about that time, one of officers closed the driver's door of the Nissan, which unexpectedly caused all four doors to lock automatically.

Sergeant Martin Tchakirides soon arrived and asked the defendant if he had the key to the Nissan.  The defendant made a motion with his head indicating that the key could be found in the vicinity of a nearby garage.  A search of the area produced a number of items the defendant had discarded as he fled, including the black hat he was seen wearing in the car, more cash, a set of house keys, and the key to the Nissan.  Donnelly used the car key to open the glove compartment, and proceeded to seize the handgun and narcotics that are the subject of the defendant's motion to suppress.

DISCUSSION

Under the Fourth Amendment, a car may be searched without a warrant if police have probable cause to believe it contains

contraband.  See United States v. Ross, 456 U.S. 798, 804-09
(1982).  This exception to the warrant requirement is based on
the reduced expectation of privacy people have in their cars and
on the ready mobility of cars, which can make obtaining a warrant
impractical.  When police have probable cause to believe a car
contains contraband, they are entitled to search the entire car
and its contents, including any containers.  See Wyoming v.
Houghton, 526 U.S. 295, 301-02 (1999); Ross, 456 U.S. at 823.
Probable cause to search is "a fair probability that contraband
or evidence of a crime will be found in a particular place."
Illinois v. Gates, 462 U.S. 213, 238 (1983).

     The facts set forth above, viewed from the standpoint of an
objectively reasonable police officer, provided probable cause to
search the defendant's glove compartment for contraband.  The
defendant's large wad of more than $3,500 in cash, bundled and
stacked in the manner used by drug dealers, gave the officers
probable cause to believe both that he was an experienced drug
dealer and that he was actively dealing.  They had no specific
information that he was transporting drugs in his car that
particular day.  But his extreme behavior after Officer Herbert
tried to stop him for speeding strongly suggested that he was.
Otherwise, why would he lead the officers on a car chase,
endangering himself and others, only to ditch the car at the
sight of Officer Donnelly, then flee on foot, jumping over

fences, discarding anything that could link him to the car?  The
most likely explanation for this behavior was that the car
contained contraband, which the police might very well find in
the course of a routine motor vehicle stop.  Donnelly had been
able to search the car's interior without difficulty because the
defendant, in his haste to get away from the car, had left the
driver's door wide open.  That left the glove compartment as a
hiding place for contraband.  Officer Herbert had seen the
defendant lean toward the glove compartment just before he fled,
while the car was still going about 10 miles an hour.  This
behavior was so unusual in Herbert's experience that he asked the
defendant to explain it.  In response to Herbert's inquiry, the
defendant had confirmed that he was going to open the glove
compartment, but the glove compartment remained curiously locked.

     In these circumstances, viewed in their totality, a
reasonable police officer could conclude that, in fact, the
defendant had reached for the glove compartment because it
contained contraband.  This would readily explain his otherwise
seemingly inexplicable flight from Officer Herbert, his
abandonment of the car when he saw Officer Donnelly's cruiser,
his subsequent attempt to avoid capture, and his discarding of
objects that could link him to the car, including the key one
would need to open the glove compartment.  Since the officers had
probable cause to believe the glove compartment contained

contraband, the warrantless search was reasonable under the Fourth Amendment.

<u>CONCLUSION</u>

Accordingly, the defendant's motion to suppress is hereby denied.

So ordered this 9th day of November 2005.


```
                           _____/s/_____
                              Robert N. Chatigny
                           United States District Judge
```